OPINION
{¶ 1} This appeal arises from the conviction and sentence of appellant, Larry M. Schlee, on one count of aggravated murder for the murder of Frank Carroll ("Carroll") in 1980. Appellant was given a life sentence by the Lake County Court of Common Pleas. A brief review of the procedural history of this case is in order.
 {¶ 2} Appellant was initially indicted on one count of aggravated murder in 1992. He pleaded not guilty and the matter proceeded to a jury trial. On March 31, 1993, the jury returned a guilty verdict, and appellant was sentenced to life imprisonment with parole eligibility after twenty years.
 {¶ 3} Appellant appealed his conviction to this court, and in Statev. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 WL 738452, this court affirmed appellant's conviction. Subsequently, appellant filed two motions for postconviction relief which were both overruled by the trial court, and affirmed by this court.
 {¶ 4} On July 2, 2002, appellant filed a motion for a new trial based upon newly discovered evidence and prosecutorial misconduct. The trial court granted this motion on August 21, 2002. The state of Ohio filed a notice of appeal and a motion for leave to appeal on September 20, 2002, but this court denied the state's motion on March 24, 2003. On June 19, 2003, the trial court set a trial date of November 3, 2003. On October 3, 2003, upon joint motion, the trial court continued the new trial until March 8, 2004.
 {¶ 5} The new trial began as scheduled on March 8, 2004. Prior to commencement of the trial, appellant filed a motion to dismiss the charge on speedy trial grounds. The trial court denied appellant's motion and proceeded with the trial. On March 19, 2004, the jury returned a guilty verdict. On March 26, 2004, appellant was sentenced to life imprisonment with parole eligibility after fifteen years.
 {¶ 6} On April 2, 2004, appellant filed a motion for a new trial, which the trial court overruled on April 15, 2004 after a hearing.
 {¶ 7} Appellant timely filed a notice of appeal.
 {¶ 8} Some of the following facts are taken directly from this court's opinion in appellant's first appeal.
 {¶ 9} Appellant first met the decedent while the two were in high school in 1966. Over the years, the two developed a close friendship. In 1977 or 1978, Carroll introduced appellant to Amy Binns Woodsby ("Woodsby"). Carroll and Woodsby were dating each other at that time. However, by June 1979, Woodsby had become intimately involved with appellant, and the friendship between appellant and Carroll deteriorated.
 {¶ 10} In the early morning hours of June 3, 1979, appellant's car was set on fire while he and Woodsby were at his home. Appellant and Woodsby conveyed to the police that they believed Carroll had set the blaze. Later that morning, Carroll appeared at appellant's home and began to assault Woodsby. Appellant broke up the fight. Carroll went to his car and returned with a rifle which he fired at appellant and Woodsby. Appellant returned fire striking Carroll in the chin. As a result of this incident, Carroll was charged with felonious assault, but appellant was not indicted as his actions were deemed to be "self defense." Carroll's pretrial was scheduled for February 5, 1980.
 {¶ 11} Woodsby testified that on February 2, 1980, appellant asked her to accompany him to a park to meet with Carroll. Woodsby testified that prior to this date, appellant had expressed concern that Carroll would report appellant's drug dealing activities to the authorities in retaliation for proceeding with the felonious assault charge. The meeting was allegedly for appellant and Carroll to resolve their differences and perhaps make a deal whereby appellant would dismiss the felonious assault charge if Carroll would refrain from reporting appellant's drug trafficking to the authorities. After the alleged meeting occurred, no one ever saw Carroll alive again.
 {¶ 12} According to Woodsby, at appellant's direction, she hid under a blanket in the back seat when they went to meet Carroll. They arrived at the designated meeting place first and had to wait a few minutes for Carroll to arrive. After Carroll arrived, Woodsby heard the two men talking and she testified that she thought they were working out their differences. Then she heard shots being fired from a gun. Her testimony was inconsistent as to whether she actually saw appellant fire his last shot at Carroll, or whether she stayed under the blanket and just heard the gun shots. In either case, she testified that appellant told her not to tell anyone about what had happened or that she would end up "just as dead as Frank."
 {¶ 13} Woodsby stated that she saw appellant take a wallet and keys from Carroll's pockets, and he proceeded to first wrap the body in plastic, then into a sleeping bag, before sealing these wrappings with duct tape. She then helped appellant put the body in the trunk of appellant's car.
 {¶ 14} Appellant and Woodsby then drove Carroll's car and appellant's car to Cleveland Hopkins Airport where they parked Carroll's car on the top level of the parking deck. Appellant put Carroll's wallet in the glove compartment, locked the doors, and took the keys with him. According to Woodsby, appellant wanted to make it look like Carroll had fled prosecution of the felonious assault charge.
 {¶ 15} Woodsby testified that they drove east on Interstates 2 and 90 towards Pennsylvania to dispose of the body. She stated that they dumped the body in a wooded area, and then returned to Ohio disposing of pieces of the murder weapon along the way.
 {¶ 16} The prosecution submitted appellant's 1993 trial testimony in its case in chief. In the first trial, appellant testified that he spent the weekend of February 2, 1980, at his grandmother's house in Lake County.
 {¶ 17} At some point shortly after the crime, Woodsby told her boss, John Turchik ("Turchik"), about the murder. There is a dispute in the present proceeding as to whether that conversation took place on February 4, 1980 or two weeks later, on February 18 or 19, 1980, although the trial testimony in the second proceeding was consistent that this conversation occurred on February 4, 1980.
 {¶ 18} During the summer of 1980, nearly seven months after Carroll had last been seen, his car was discovered parked in the airport garage, exactly where Woodsby testified that appellant had parked it. Found in the glove compartment were the deceased's wallet and checkbook with a date of February 2, 1980 as the last entry in the register.
 {¶ 19} In the fall of 1980, Woodsby and appellant moved to Arizona where they lived together, off and on, until early 1983. After the two parted company, Woodsby, in April of 1983, wrote a letter describing the murder. She gave the narrative to her lawyer in case anything happened to her. Finally, in 1992, Woodsby contacted the Mentor, Ohio police department to report the murder of Carroll.
 {¶ 20} Based upon the allegations made by Woodsby in 1992, a Lake County Sheriff's Deputy traveled to Westfield, New York, in order to inspect an unidentified skeleton, which had been discovered in October of 1981. The body was wrapped in materials similar to those described by Woodsby. There were some personal effects on the body, which were later identified by Carroll's daughter as belonging to her father. The deputy testified that the route he took from Painesville to where the body was found in New York was very similar to the path described by Woodsby. The identity of the body was also confirmed from dental records.
 {¶ 21} Appellant has now set forth the following assignments of error:
 {¶ 22} "[1.] The trial court erred to the prejudice of the defendant-appellant and committed reversible error by giving the jury improper and misleading instructions.
 {¶ 23} "[2.] The defendant-appellant's right to due process and a fair trial were substantially prejudiced by the ineffective assistance of counsel.
 {¶ 24} "[3.] The trial court erred and/or abused its discretion to the prejudice of defendant/appellant when it denied his request for a new trial.
 {¶ 25} "[4.] The trial court erred and/or abused its discretion to the prejudice of defendant-appellant when it did not grant appellant's motion to dismiss for violation of speedy trial — and — when it denied his motion to dismiss without conducting a hearing.
 {¶ 26} "[5.] The trial court erred and/or abused its discretion and trial counsel was ineffective in other ways to the prejudice of defendant-appellant."
 {¶ 27} In the first assignment of error, appellant contends that the trial court erred by giving the jury improper and misleading instructions. We note that since there were no objections made to the jury instructions at the trial court level, we must analyze this assignment of error under a plain error analysis pursuant to Crim.R. 52(B).
 {¶ 28} It is well established that "[t]he failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would havebeen otherwise." (Emphasis added.) State v. Underwood (1983),3 Ohio St.3d 12, syllabus, citing State v. Long (1978), 53 Ohio St.2d 91; Crim.R. 52(B). Furthermore, "`notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" State v. Gordon
(Mar. 22, 1996), 11th Dist. No. 92-A-1696, 1996 Ohio App. LEXIS 1078, at 3-4, quoting Long, supra, paragraph three of the syllabus.
 {¶ 29} Appellant first claims that the jury verdict form was improperly worded since it required the jury to find him either guilty or not guilty "beyond a reasonable doubt." The verdict form stated as follows:
 {¶ 30} "We, the jury, find, beyond a reasonable doubt, that defendant, Larry M. Schlee, . . . . . . . . . . . . . . . of Aggravated Murder." Under the dotted line were the words, "Insert in ink: `Guilty' or `Not Guilty.'"
 {¶ 31} Appellant accurately states that in criminal cases, a jury must find the defendant guilty beyond a reasonable doubt in order for a conviction to occur. If they are unable to find the defendant guilty beyond a reasonable doubt, then the defendant is not guilty. It is not required that a defendant be found not guilty beyond a reasonable doubt.
 {¶ 32} The verdict form in the present case seemingly gave the jury two choices: to find appellant guilty beyond a reasonable doubt; or find him not guilty beyond a reasonable doubt. It is not necessary to find a defendant not guilty "beyond a reasonable doubt." State v. Harris (Dec. 18, 1995), 5th Dist. No. 95-8, 1995 WL 848203, at 7. Clearly, the verdict language provided by the trial court was erroneous on its face. However, a single jury instruction should not be judged in isolation but, instead, must be considered in the context of the overall charge. Statev. Price (1979), 60 Ohio St.2d 136, paragraph four of the syllabus, citing Cupp v. Naughten (1973), 414 U.S. 141, 147. Thus, the entire jury charge must be considered as a whole to determine whether plain error occurred.
 {¶ 33} A review of the complete jury instructions reveals that the trial court explicitly and repeatedly emphasized to the jury that the state had the burden of proving appellant guilty beyond a reasonable doubt. The jury was instructed, in part, as follows:
 {¶ 34} "The defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The defendant must be acquitted unless the State produced evidence which convinces you beyond a reasonable doubt of every essential element of the offense charged in the indictment.
 {¶ 35} "* * *
 {¶ 36} "The defendant is charged with aggravated murder. Before you can find the defendant guilty you must find beyond a reasonable doubt that on or about the second day of February, 1980, and in Lake County, Ohio, the defendant purposely and with prior calculation and design caused the death of Frank M. Carroll.
 {¶ 37} "* * *
 {¶ 38} "If you find that the State proved beyond a reasonable doubt that the defendant purposely and with prior calculation and design caused the death of Frank M. Carroll, then you must find the defendant guilty of aggravated murder. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of aggravated murder, then your verdict must be not guilty of aggravated murder.
 {¶ 39} "* * *
 {¶ 40} "You must consider the offense charged in the indictment, namely, aggravated murder. If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of aggravated murder, your verdict must be guilty of aggravated murder. However, if you find that the State failed to prove beyond a reasonable doubt all the essential elements of aggravated murder then your verdict must be not guilty of that offense, and in that event you will continue your deliberations to decide whether the State has proved beyond a reasonable doubt all the essential elements of the lesser included offense of murder."
 {¶ 41} It is clear that these statements by the trial court were consistent and accurate. None of these instructions even implied that appellant had any burden to prove his innocence. Additionally, under the instruction given to the jury, if the conclusion reached had not been "guilty beyond a reasonable doubt," the next logical step would have been for the jury to consider the lesser included offense. They did not do so which leads to the conclusion that the jury had no problem finding appellant guilty beyond a reasonable doubt.
 {¶ 42} Accordingly, while the jury verdict form itself was flawed, when taken as a whole, the jury instructions were not so tainted as to rise to the level of plain error. The trial court's other instructions limited any potential prejudice. There was overwhelming evidence of appellant's guilt presented at trial so, but for the flaw in the jury verdict form this court can not conclude that the outcome of the trial would have been different.
 {¶ 43} Next, appellant maintains that the trial court's instruction on the lesser included offense of murder was also erroneous. Specifically, appellant asserts that the tainted verdict form previously discussed misled the jury with respect to the lesser included offense instruction by defining "not guilty" to mean "not guilty beyond a reasonable doubt."
 {¶ 44} The instruction in question stated in its entirety:
 {¶ 45} "If your verdict is `guilty' of AGGRAVATED MURDER, then you will not complete the next page of the verdict form. If your verdict is `not guilty' of AGGRAVATED MURDER, or if you are unable to reach a verdict of `guilty' or `not guilty' of AGGRAVATED MURDER, then you will continue your deliberations to decide whether the state proved beyond a reasonable doubt all the essential elements of the lesser included offense of MURDER. When all of you are agreed whether the defendant is `guilty' or `not guilty' of the lesser included offense of MURDER, you will complete the MURDER verdict below by inserting the word `guilty' or the words `not guilty' in accordance with your agreement and by signing that completed verdict."
 {¶ 46} It is clear that the heart of the preceding instruction was taken directly from Ohio Jury Instructions, Section 413.21, and is a correct statement of the law. State v. Spaliatsos (Sept. 16, 1983), 11th Dist. No. 1315, 1983 WL 6099.
 {¶ 47} Appellant relies on the case of State v. Muscatello (1977),57 Ohio App.2d 231, to support his claim that the trial court's instruction as to the lesser included offense of murder was improper. In fact, however, the Muscatello decision supports the trial court's instruction. In Muscatello, the Eighth District Court of Appeals stated, at 251:
 {¶ 48} "The correct rule of law is that a jury must unanimously agree that a defendant is guilty of a particular offense before returning a verdict of guilty on that offense. If a jury is unable to agree unanimously that a defendant is guilty of a particular offense they may proceed to consider a lesser included offense upon which evidence has been presented." This decision was affirmed by the Supreme Court of Ohio inState v. Muscatello (1978), 55 Ohio St.2d 201. There is no conflict between this rule of law and the instruction given by the trial court in the case sub judice. Both require the jury to do the same exercise.
 {¶ 49} In fact, the language from Muscatello was the source for the 1982 change in the Ohio Jury Instructions. Spaliatsos, supra, at 3. The language used by the trial court in this case is a reflection of the syntax used in Muscatello. The instruction, structured as it was, did not require the jury to make a unanimous determination that appellant was not guilty of aggravated murder before it considered the lesser included offense of murder. This was a proper instruction.
 {¶ 50} Appellant contends that the trial court "defined" not guilty as meaning "not guilty beyond a reasonable doubt" in the first portion of the jury verdict form. In fact, the court never defined the term "not guilty" but only qualified that term with the words "beyond a reasonable doubt." That is an important difference. There is no need, and in fact it would be improper, to assume that every other time the trial court used the term "not guilty" elsewhere in the body of its instructions that it meant "not guilty beyond a reasonable doubt." Hence, there is no reason to assume that the jury could not, or did not, follow the instructions as given.
 {¶ 51} Finally, appellant challenges the alibi instruction that was given by the trial court. He argues that the instruction imposed a burden of persuasion upon him rather than simply a burden of production. The instruction reads as follows:
 {¶ 52} "If the evidence fails to establish that the defendant was elsewhere, such failure does not create an inference that the defendant was present at the time when and at the place where an offense may have been committed. If after a consideration of the evidence of alibi, along with all the evidence, you are not convinced beyond a reasonable doubt that the defendant was present at the time in question, you must return a verdict of not guilty."
 {¶ 53} This instruction was also taken directly from Ohio Jury Instructions, Section 411.03, and has held to be the correct instruction on alibi. It, too, has been held to be a proper and valid statement of law on that issue in a number of cases. State v. Thompkins (Nov. 22, 1995), 2nd Dist. No. C-940513, 1995 WL 688789, at *5; State v. Scott
(1987), 41 Ohio App.3d 313, 317; State v. Jones (Apr. 25, 1994), 12th Dist. No. CA93-05-016, 1994 WL 142503, at 2; State v. Malone (Dec. 19, 1989), 10th Dist. No. 89AP-504, 1989 WL 153567, at 5.
 {¶ 54} Accordingly, this court concludes that the alibi instruction given in this case was proper.
 {¶ 55} Based upon the foregoing analysis, the trial court did not commit reversible error in giving the jury improper or misleading instructions.
 {¶ 56} Appellant's first assignment of error is without merit.
 {¶ 57} In the second assignment of error, appellant submits that his right to due process and a fair trial was violated due to ineffective assistance of counsel. This court recently set forth the standard for analyzing whether ineffective assistance has occurred. In State v.Patrick, 11th Dist. Nos. 2003-T-0166 and 2003-T-0167, 2004-Ohio-6688, at ¶ 28-30, this court held:
 {¶ 58} "To warrant a reversal on the grounds that appellant was not provided with effective assistance of counsel, [he] bears the burden of meeting the two-prong test set forth in Strickland v. Washington (1984),466 U.S. 668, 687 * * *, which states that: `(a) convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction (* * *) has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction (* * *) resulted from a breakdown in the adversary process that renders the result unreliable.'
 {¶ 59} "In order to decide if an attorney's performance was deficient, the trial court must inquire whether the attorney provided `reasonably effective assistance, considering all the circumstances.'State v. Loza (1994), 71 Ohio St.3d 61, 83 * * *, citing Strickland,
supra. `A Sixth Amendment violation does not occur "unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." * * *' State v. Goodwin (1999),84 Ohio St.3d 331, 334 * * *, quoting State v. Bradley (1989),42 Ohio St.3d 136, 142 * * *. In addition, a properly licensed attorney is presumed to be competent, and thus, judicial scrutiny of his or her performance must be highly deferential. Strickland, 466 U.S. at 689. An attorney's strategic decisions and trial tactics will not support a claim of ineffective assistance. State v. Clayton (1980), 62 Ohio St.2d 45, 48-49
* * *.
 {¶ 60} "Under the second prong of the Strickland test, appellant must show that [he] was prejudiced. To establish prejudice, appellant must prove that `there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.'Bradley, 42 Ohio St.3d at paragraph three of the syllabus. See, also,State v. Stojetz (1999), 84 Ohio St.3d 452, 457 * * *. `A reasonable probability is a probability sufficient to undermine confidence in the outcome.' State v. Bays (1999), 87 Ohio St.3d 15, 27 * * *. See, also,State v. Brant (Aug. 4, 2000), 11th Dist. No. 99-P-0037, * * * 2000 WL 1114845." (Parallel citations omitted.)
 {¶ 61} In the present case, appellant claims that his trial counsel was ineffective for failing to object to the trial court's jury instructions, which he alleged were improper in his first assignment of error. For the reasons stated in response to appellant's first assignment of error, this court in effect held that substantially all of the jury instructions were proper, except for the verdict form language. Obviously, the failure to object to legally correct jury instructions can not constitute ineffective assistance of counsel. State v. McKoy (Feb. 17, 2000), 8th Dist. No. 74763, 2000 Ohio App. LEXIS 571, at 31-32.
 {¶ 62} Again, the only portion of the jury instruction that was incorrect was on the jury verdict form where the jury was asked to find appellant guilty or not guilty "beyond a reasonable doubt." However, as pointed out in our earlier analysis, that error was not prejudicial. Appellant has failed to show that a reasonable probability exists that, were it not for counsel's error, the result of the trial would have been different.
 {¶ 63} Accordingly, appellant was not denied the effective assistance of counsel.
 {¶ 64} Appellant's second assignment of error is without merit.
 {¶ 65} In the third assignment of error, appellant asserts that the trial court abused its discretion by denying his request for a new trial. Specifically, appellant claims that the affidavits of Turchik, Jeff Elersic ("Elersic"), and trial counsel, Charles Grieshammer (Grieshammer"), constituted newly discovered evidence pursuant to Crim.R. 33(A)(6), and that he was surprised by some of the new evidence under Crim.R. 33(A)(3).
 {¶ 66} At trial, Woodsby's boss, Turchik, testified that she told him about the murder after returning to work from a weekend in early February 1980. Turchik understood that the murder had occurred during that past weekend, which would have been consistent with Woodsby's testimony that the murder occurred on February 2, 1980. That date was also consistent with the fact that nobody saw Carroll alive after February 2, 1980.
 {¶ 67} In support of his motion for a new trial, appellant provided the trial court with an affidavit from Turchik. In that affidavit, Turchik stated that after thinking about his testimony further, and speaking with another coworker named "Reno," he then recalled that his conversation with Woodsby did not occur until February 18th or 19th of 1980, or, approximately two weeks later than he had claimed at trial.
 {¶ 68} Appellant also provided an affidavit from Elersic. In his affidavit, Elersic stated that sometime in the middle of February 1980, Woodsby inquired of him if he "knew of anyone who would kill" the victim.
 {¶ 69} It is appellant's contention that the two-week discrepancy is vital to his defense. He offers the theory that Carroll may have fled the area on February 2, 1980 so as to avoid prosecution of the pending felonious assault charge. Then, in mid-February, Woodsby took a trip to Florida with the thought of hiring a "hit-man" to kill Carroll, who had been causing Woodsby trouble. The murder was then committed on the weekend of February 16, 1980 by a paid assassin. That would explain why it was not until February 18th or 19th that Woodsby told Turchik of the murder. Appellant asserts that under this alternative theory of the murder, he would be exonerated of the crime.
 {¶ 70} In the affidavit from trial counsel, Grieshammer, he stated that he talked to Turchik prior to trial and that the closest estimate Turchik could give him as to the date of the conversation with Woodsby was late February or early March of 1980. Thus, Grieshammer was surprised when, at trial, Turchik testified that the conversation occurred on February 4, 1980, and that the crime had just occurred during the preceding weekend.
 {¶ 71} Crim.R. 33(A)(6) provides in part that a new trial may be granted on the motion of the defendant "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial. * * *" In order to prevail on a motion for a new trial under Crim.R. 33(A)(6), the defendant must establish that the new evidence: "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. (* * *)" State v.Hawkins (1993), 66 Ohio St.3d 339, 350, quoting State v. Petro (1947),148 Ohio St. 505, syllabus.
 {¶ 72} Additionally, the granting of a motion for a new trial is within the sound discretion of the trial court and an appellate court will not reverse absent an abuse of discretion. State v. Williams
(1975), 43 Ohio St.2d 88. The term "abuse of discretion" connotes more than an error of law or judgment. Rather, it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. State v.Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 73} In the case at bar, appellant argues that the affidavit of Turchik, in which he changed his mind as to the date of his conversation with Woodsby, was not known until after the trial and, thus, was newly discovered evidence. The record does not support this claim.
 {¶ 74} According to Turchik's affidavit, he told Nancy Robison, an investigator for the Lake County Public Defender's Office, prior totrial, that he "believed" the conversation occurred in late February or early March of 1980. Grieshammer also admitted that he spoke to Turchik prior to trial and was told that "to the best of [Turchik's] recollection the conversation between he and [Woodsby] that he testified to in the trial happened in late February, 1980."
 {¶ 75} Thus, it is clear that appellant's counsel knew prior to trial that there was some doubt in Turchik's mind as to exactly when the conversation occurred. Turchik never indicated to anyone that he was quite certain that the conversation took place in late February or early March of 1980. Hence, it is difficult to accept that appellant was truly surprised by Turchik's testimony at trial. Further, it is clear that counsel had this information if not prior to trial, at least during trial — so it was not evidence that was newly discovered after trial. Finally, under the sixth prong of the Petro test, it is apparent that this "new" evidence was nothing more than a contradiction of the "former" evidence and, therefore, did not warrant the granting of a new trial.
 {¶ 76} As for the affidavit from Elersic, it is undisputed that appellant's trial counsel knew of this witness, and what he had to add to the evidence, as of the second or third day of the trial. This was clearly before the defense even began to present its case to the jury.
 {¶ 77} Therefore, this also did not qualify as newly discovered evidence since it existed during the course of the trial. Appellant asserts that while he knew of Elersic, he was not aware of the time frame when Elersic spoke to Woodsby until Elersic testified at trial. There is no evidence in the record, however, that Elersic was attempting to hide the date of his conversation. This appears to be a case where nobody bothered to try and pin him down as to when that conversation occurred. If due diligence had been exercised, that information could have been obtained prior to trial. Under these circumstances, this court must conclude that this was not newly discovered evidence.
 {¶ 78} Based upon the foregoing analysis, the trial court's attitude in denying appellant's motion for a new trial was not unreasonable, arbitrary, or unconscionable. Thus, the trial court did not abuse its discretion in denying appellant's motion.
 {¶ 79} Appellant's third assignment of error is without merit.
 {¶ 80} In the fourth assignment of error, appellant asserts that the trial court abused its discretion by denying his motion to dismiss on speedy trial grounds without first conducting a hearing. Appellant relies on R.C. 2945.71 et seq. which provide the statutory speedy trial provisions in Ohio. Those sections generally require, in felony cases, that an accused be brought to trial within two hundred seventy days after his arrest, or ninety days if he is in jail in lieu of bail on the pending charge under the 3-for-1 provision.
 {¶ 81} It is undisputed that more than ninety days passed between the time the motion for new trial was granted and the new trial began, and that appellant was in jail during that entire time period. However, it is well established in Ohio that the statutory speedy trial provisions are not applicable to retrials. State v. Fanning (1982), 1 Ohio St.3d 19, 21;State v. Parker, 8th Dist. No. 82687, 2004-Ohio-2976, at ¶ 18; State v.Bigley, 9th Dist. No. 02CA0017-M, 2002-Ohio-4149, at ¶ 21; State v.Echols (2001), 146 Ohio App.3d 81, 91; State v. Laird (Dec. 15, 2000), 11th Dist. No. 99-P-0069, 2000 Ohio App. LEXIS 5924, at 14.
 {¶ 82} Instead, the issue in a retrial is whether the delay was constitutionally reasonable. Fanning at 21. In Barker v. Wingo (1972),407 U.S. 514, 530, the Supreme Court of the United States set forth a four-pronged test to determine what is a reasonable delay. Under that test, a court should consider: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial rights; and (4) the prejudice to the defendant.
 {¶ 83} Additionally, the court stated: "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." Id. at 530-531.
 {¶ 84} In the present case, appellant was granted a new trial on August 21, 2002. Appellee filed an appeal from that decision on September 20, 2002, which was denied by this court on March 24, 2003. The trial court scheduled the retrial for November 10, 2003, which was later continued to March 8, 2004, by consent of both parties for the purpose of conducting DNA testing. Accordingly, the length of the delay attributable to the state totaled two hundred sixty-one days.
 {¶ 85} This court has previously held that when a defendant is granted a new trial, the time in which the prosecution seeks appellate review of that decision is not chargeable to the state. "It would be unreasonable to fashion a rule requiring the state to bear the expense of conducting a second prosecution where the conviction obtained after the first may be reinstated * * *. Under these circumstances, the state's interest in judicial economy outweighs the individual's interest in a speedy, public trial." State v. Montaz-Pagan (Oct. 18, 1996), 11th Dist. No. 96-T-5451, 1996 WL 648733, at 3.
 {¶ 86} "Generally, delays over one year are presumptively prejudicial." Echols at 91, citing State v. Kelly (1995),101 Ohio App.3d 700, 705. In this case, the length of the delay — from March 24, 2003, until November 10, 2003 — was less than one year, so the delay was not presumptively prejudicial. Therefore, the remainingBarker factors do not have to be addressed. Barker at 530-531. However, even if those factors were taken into consideration, it is clear that the relatively short delay was not prejudicial to appellant given the fact that over twenty-four years had already passed since the crime occurred.
 {¶ 87} Thus, the trial court did not abuse its discretion by denying his motion to dismiss on speedy trial grounds.
 {¶ 88} Appellant's fourth assignment of error is without merit.
 {¶ 89} In the fifth assignment of error, appellant contends that the trial court abused its discretion and that trial counsel was ineffective in other ways that were prejudicial to him.
 {¶ 90} Under this assignment of error, appellant briefly mentions three issues that he wants to preserve for future proceedings. Appellant admits that these issues are either not properly before this court, or that they are not winnable at the appellate level, but that he must introduce them in order to litigate these issues at the Ohio Supreme Court level or in federal courts. The first issue involved whether or not the testimony given by three witnesses to the grand jury was false. The second issue involved the use of appellant's testimony from his first trial at his second trial when he chose not to testify at the second trial. The third issue involved the trial court's alleged failure to give the jury a special instruction regarding accomplice testimony.
 {¶ 91} However, since appellant did not brief these issues in accordance with the appellate rules, this court will not address the issues.
 {¶ 92} Appellant's fifth assignment of error is without merit.
 {¶ 93} Based upon the foregoing analysis, the judgment of the trial court is hereby affirmed.
Grendell, J., Rice, J., concur.